IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARIA PASSIG,                          )
                                       )
                    Plaintiff,         )
                                       )
vs.                                    )    Civil No.  15-cv-1148-JPG-CJP
                                       )
CAROLYN W. COLVIN,                     )
Acting Commissioner of Social Security,)
                                       )
                    Defendant.         )
                                       )

## MEMORANDUM and ORDER

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Maria Passig is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for DIB on May 31, 2012.  She alleged disability beginning on January 12, 2012 (Tr. 59).  After holding a hearing, Administrative Law Judge (ALJ) Bradley L. Davis denied the application in a decision dated May 13, 2014 (Tr. 59-71).  The Appeals Council denied review and the decision of the ALJ became the final agency decision (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issue:

1. The ALJ's residual functional capacity (RFC) finding did not account for plaintiff's deficiencies in concentration, persistence, or pace.

1

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.  The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement.  The third step compares the impairment to a list of impairments that are considered conclusively disabling.  If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.  The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work.  If an applicant can engage in past relevant work, he is not disabled.  The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.  If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined:   (1) whether the claimant is presently

unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled….  If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to understand that the scope of judicial review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)(citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).   This Court uses the Supreme Court's definition of substantial

evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Davis followed the five-step analytical framework described above. He determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of pelvic floor disorder, fibromyalgia, depression, anxiety, migraine headaches, obesity, ventral hernia, diverticulitis and chronic constipation. The ALJ further determined that these impairments did not meet or equal a listed impairment (Tr. 61).

The ALJ found that plaintiff had the RFC to perform work at the light level with physical and mental limitations (Tr. 63). Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was unable to perform her past relevant work. However, she was not disabled because she was able to do other work that existed in significant numbers in the regional and national economies (Tr. 69-71).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised

by the plaintiff.

### 1.  Agency Forms

Plaintiff was born on October 22, 1964, and was forty-nine years old when ALJ Davis issued his opinion.  She is insured for DIB through December 31, 2016[1] (Tr. 217).  She was five feet tall and weighed one hundred and sixty pounds (Tr. 220).  She completed two years of college in 1998.  She previously worked as a certified nurse's assistant for an insurance company and as a dental assistant in a dentist office (Tr. 221).

Plaintiff claimed her pelvic floor disorder, problems with her right leg and lower back, fatigue, migraines, fibromyalgia and depression limited her ability to work (Tr. 220).  She took several medications and, as of July 2012, she was taking:  Bystolic for high blood pressure; Citalopram for migraines; Omeprazole for acid reflux; Savella for fibromyalgia; Wellbutrin for depression; Gabapentin for neuropathy; and Zolpidem Tartrate as a sleep aid (Tr. 223).

Plaintiff completed function reports in September 2012 and January 2013 (Tr. 240-50, 274-84).  She lived in a house with her family and stated that pain limited her ability to stand, walk, sit and lift items.  Her fibromyalgia caused problems in her left arm, shoulder and ankle (Tr. 240, 274).  Plaintiff stated that on a daily basis she read, took her medicine, took a bath, folded the laundry and made simple meals.  She, her husband and her son cared for two dogs (Tr. 241, 275).  Plaintiff cleaned the dishes, swept the floors, did laundry and prepared three or four quick meals per week (Tr. 242, 276).  She was able to drive, handle her finances, and grocery shop once a week (Tr. 243, 277).  She attended Alcoholics Anonymous meetings two to three times a week and visited her in-laws at a nursing home (Tr.244, 278).

Plaintiff claimed she had difficulty lifting, squatting, bending, standing, reaching,

---

[1] The Court notes that the evidence on record indicates plaintiff is insured for DIB through December 31, 2016 (Tr. 217).  However, the ALJ's opinion indicates that plaintiff's date last insured is December 31, 2017 (Tr. 59).

walking, sitting, kneeling, climbing stairs and concentrating.  She said she had difficulty getting back up after squatting, bending or kneeling.  She could walk for thirty minutes at a time before needing fifteen to twenty minutes of rest (Tr. 245, 279).  She had no problems following instructions or getting along with authority figures (Tr. 245-46, 279-80).  Plaintiff also stated that she had trouble opening jars and picking up small objects, and could only carry light items (Tr. 248).

Plaintiff's husband also completed two function reports (Tr. 231-37, 267-73).  He indicated plaintiff's weakness, fatigue and pain limited her ability to work (Tr. 231).  He stated plaintiff spent most of her day doing light housework, reading the newspaper and watching television (Tr. 232, 267).  He stated plaintiff had difficulty sleeping and could not carry the laundry after she washed it (Tr. 232-33).  Plaintiff cooked dinner for her husband four times a week and did light cleaning two or three times a week (Tr. 233, 268).  Plaintiff's husband had to help her shop for groceries once a week (Tr. 234, 269).  He indicated that plaintiff had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs and completing tasks.  She could walk for fifteen to twenty minutes, lift or carry up to ten pounds, and sit for more than a half hour (Tr. 235, 271).  She had no difficulty paying attention, following instructions or respecting authority figures (Tr. 235-36, 271-72).

## 2.  Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on April 1, 2014 (Tr. 83).  She lived with her husband and her twenty-one-year-old son (Tr. 88).  She testified that she received an associate's degree in 1997 (Tr. 89).

Plaintiff indicated that stress, pressure and knowing she was going to be unable to perform the duties of her job caused her to stop working on January 12, 2012 (Tr. 89).  She

stated that the most significant problem she had that prevented her from working was her pelvic floor disorder.  She rated her pain as a five to seven out of ten on a daily basis.  Her pain caused difficulties with her right foot and made climbing stairs problematic (Tr. 90).  Plaintiff felt she could stand for about an hour if she could hold on to a cart or counter, but she could only stand for about four hours total in a workday (Tr. 91).  She typically spent most of her day lying down with her feet up.  She drove her car at least once a week to go to her Alcoholics Anonymous meeting, but at the time of the hearing she had not been in about a month because she was too tired (Tr. 92).

Plaintiff stated that her fibromyalgia affected her left arm, shoulder and lower back (Tr. 93-94).  She indicated she had physical therapy to help treat a pelvic floor problem but did not experience much relief (Tr. 94).  She had problems with her gallbladder and a hernia that made it difficult to sleep and she experienced migraines about once or twice a month (Tr. 95-96).  Plaintiff testified the heaviest thing she could carry was a gallon of milk (Tr. 97).  She made light meals but needed help getting the pots and pans out.  She stated that her son and daughter helped with laundry (Tr. 98).  She felt that her fatigue was what kept her from being able to complete more household chores (Tr. 98).  She took Ambien to help her sleep but it caused her to be drowsy throughout the next day (Tr. 99).

Plaintiff saw a counselor for depression but at the time of the hearing she did not have any medications prescribed specifically for depression (Tr. 100).  She testified that she had difficulty concentrating some days (Tr. 101).  Plaintiff went to the store to buy groceries about once a week but needed help from her oldest daughter to complete the trips.  She testified that if she sat for too long, she had a significant amount of pain and her feet would begin to tingle (Tr. 102).

A vocational expert (VE) also testified.  The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform light, unskilled work and should avoid all hazards such as unprotected heights and moving machinery.   Additionally, the individual should only occasionally be required to stoop, kneel, crouch or crawl.  Finally, the person was limited to simple, routine and repetitive tasks (Tr. 105).

The VE testified that the person would be unable to perform plaintiff's previous work. However, she could do jobs that exist in significant numbers in the national economy.  Examples of such jobs are photocopy machine operator, mail clerk and cleaner (Tr. 105).  The VE testified that if the individual needed three extra breaks during an eight-hour workday lasting between fifteen and thirty minutes it would preclude employment (Tr. 106).

### 3.  Medical Treatment

Plaintiff's medical records are extensive, but her complaint focuses solely on her mental illnesses and issues with concentration, persistence and pace.  She indicates the impairments that affect concentration, persistence or pace are migraine headaches, fatigue, fibromyalgia, depression and anxiety.  As a result, this Court will focus on the portions of the record relating to these issues.

In July 2010, Plaintiff saw neurologist Dr. Sylvia Awadalla for stress-related headaches. Plaintiff stated she had headaches daily and some were severe.  However, she did not like to take medications so she typically did not treat the symptoms (Tr. 361).   Dr. Awadalla prescribed Celexa to alleviate the pain (Tr. 363).  Plaintiff returned three months later and indicated that she felt the Celexa was helping.  Her headaches were no longer debilitating but she also had chronic fatigue (Tr. 364).  Plaintiff saw Dr. Awadalla again in May 2011.  She was doing much better on

Celexa and only had two to four headaches a month (Tr. 367-69). Plaintiff did not see Dr. Awadalla again until June 2012. She stated she had headaches one or two times per week. Dr. Awadalla opined that plaintiff had symptoms which fit fibromyalgia and she told plaintiff to stop taking Celexa (Tr. 372). Plaintiff saw Dr. Awadalla again in May 2013 and indicated her symptoms had improved with therapy and medication. Dr. Awadalla opined that plaintiff's depression could be adequately controlled through counseling with her psychiatrist (Tr. 632).

In June 2011, plaintiff saw Angela McDowell, M.S., for psychological treatment (Tr. 476). She met with Ms. McDowell regularly for counseling until November 2011 when Ms. McDowell went on medical leave (Tr. 434-86). Plaintiff often complained of depression and nightmares (Tr. 465-39). When Ms. McDowell returned from medical leave in May 2012, plaintiff was still depressed and having family problems (Tr. 433). The last record with Ms. McDowell is from October 2012. Plaintiff indicated her fibromyalgia pain had increased but she was allowing herself to rest more, which helped (Tr. 487).

In June 2012, plaintiff saw an internal medicine specialist, Dr. William Bartley (Tr. 385). Dr. Bartley stated plaintiff had a lot of aches, pains and headaches. Plaintiff's movements and trigger point tenderness led him to believe she had fibromyalgia. He prescribed Savella to address her symptoms from fibromyalgia (Tr. 385). Plaintiff saw Dr. Bartley five more times between 2012 and 2013 (Tr. 550-54). In September 2012, Dr. Bartley indicated plaintiff could not return to work due to her health problems (Tr. 554). The remainder of plaintiff's treatment notes with Dr. Bartley discusses physical issues like an injury to her arm and a nonspecific rash (Tr. 550-551). She remained on medication for depression (Tr. 552).

In June 2012, plaintiff saw psychiatrist Dr. Susan Boyer for a psychiatric evaluation. Dr. Boyer opined that plaintiff had major depression with baseline anxiety. She also described

symptoms consistent with post-traumatic stress disorder (PTSD).  Dr. Boyer began plaintiff on Wellbutrin to lower her anxiety and treat her depression (Tr. 690-91).  Plaintiff saw Dr. Boyer six more times on record (Tr. 622-28).  Plaintiff continued to have headaches, family problems and difficulty sleeping.   In June 2013, plaintiff stated she was "good" mentally and her headaches were better but she still had difficulty sleeping (Tr. 624).

In April 2013, plaintiff saw rheumatologist Dr. Romila Aslam for an evaluation of fibromyalgia.  Plaintiff had some hair thinning, rashes, oral sores and weight gain (Tr. 614).  Dr. Aslam felt plaintiff's history and exam were consistent with fibromyalgia but she did not need any additional medication (Tr. 615).   Plaintiff returned later that month for results from an autoimmune workup.  Plaintiff's results were negative, and Dr. Aslam opined that plaintiff's complaints stemmed from fibromyalgia (Tr. 613).

### 4.  RFC Assessments

State agency psychological consultant Donald Henson, Ph.D., reviewed plaintiff's medical records and completed a psychiatric review technique form (Tr. 112-114).  He felt plaintiff had mild limitations in her abilities to perform activities of daily living, and maintain concentration, persistence or pace.  He opined that plaintiff was generally credible as she had a history of mental health services for symptoms of depression but her functional abilities are primarily limited by her physical condition (Tr. 113).

State agency physician Julio Pardo, M.D., assessed plaintiff's physical RFC in September 2012 (Tr. 114-18).  He reviewed plaintiff's records but did not examine plaintiff in person.  He felt plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds (Tr. 114-15).  Dr. Pardo indicated plaintiff could stand, walk or sit for six hours out of an eight-hour workday.  He stated that plaintiff could occasionally balance; stoop; kneel; crouch; crawl;

and climb ramps, stairs, ladders, ropes and scaffolds (Tr. 115).  Dr. Pardo stated that plaintiff

could perform light work and was not disabled (Tr. 117).

Plaintiff's physical RFC was evaluated a second time by Dr. Lenore Gonzalez, M.D., in

March 2013 (Tr. 120-33).  She also reviewed plaintiff's medical records but did not examine

plaintiff in person.  Dr. Gonzalez indicated that plaintiff's records showed that her pain was more

managed due to massage and hot bath therapy (Tr. 121).  As a result, Dr. Gonzalez felt plaintiff

could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds (Tr.

129).  All other limitations were the same as Dr. Pardo's initial RFC assessment (Tr. 120-33).

**5.  Treating Physicians' Evaluation**

In August 2012, Dr. Awadalla completed a form regarding plaintiff's impairments (Tr.

429-30).  Dr. Awadalla indicated she saw plaintiff one or two times a year.  Plaintiff's prognosis

was good to fair but plaintiff had problems with balance, unstable walking, depression,

headaches and sleeping.  She opined that plaintiff could sit for at least six hours out of an eight-

hour workday and stand or walk about four hours out of an eight-hour workday.  Dr. Awadalla

stated plaintiff could need to take unscheduled breaks as needed (Tr. 429).  She indicated

plaintiff could frequently lift or carry ten pounds and rarely lift or carry twenty pounds.  Plaintiff

could occasionally twist, stoop, bend, crouch and climb stairs.  Plaintiff could rarely climb

ladders and Dr. Awadalla indicated plaintiff's emotional factors, like depression, contributed to

the severity of her symptoms and functional limitations.  Plaintiff's experience of pain was often

sufficiently severe to interfere with attention and concentration.  Her impairments were likely to

cause her to miss work about three times a month (Tr. 430).

In September 2012, plaintiff's internal medicine specialist, Dr. William Bartley,

completed a medical source statement regarding plaintiff's capabilities (Tr. 483-85).  Dr. Bartley

indicated plaintiff had been under his care for several years and that he saw plaintiff every four to six months (Tr. 483-84).   Dr. Bartley stated plaintiff had chronic fibromyalgia and the symptoms included fatigue, weakness, unstable walking, blurred vision, increased muscle tension, speech or communication difficulties, pain, numbness, bladder or bowel problems, swelling, balance problems, depression, shaking tremors, headaches and weight change.  He felt plaintiff could only sit for one hour and stand or walk for two hours in an eight-hour workday. Dr. Bartley indicated plaintiff would need periods of walking around and a job that permits shifting positions at will.   Further, plaintiff would need unscheduled hour-long breaks every thirty minutes to an hour.

Dr. Bartley opined that plaintiff could occasionally lift or carry up to ten pounds and rarely lift or carry up to twenty pounds (Tr. 484).   Plaintiff could occasionally twist; rarely crouch; and never stoop, bend, or climb ladders and stairs (Tr. 484-85).   Plaintiff's depression, anxiety, and PTSD affected her pain, and her pain would often interfere with attention and concentration.   Dr. Bartley felt plaintiff had a marked limitation in her ability to deal with stress and she would need to be absent from work more than three times a month (Tr. 485).

In March 2014, one of plaintiff's mental healthcare providers, Patricia Horn, completed a medical source statement[2] (Tr. 684-88).  She rated plaintiff's highest GAF score in the last year as well as her current GAF score at 40.[3]  Ms. Horn stated that plaintiff had sleep and mood disturbances, feelings of guilt or worthlessness, difficulty thinking or concentrating, social withdraw or isolation, flat affect, decreased energy, intrusive recollections of a traumatic

---

[2] The record does not contain the treatment notes from plaintiff's time with Ms. Horn.  However, on her form she indicated she treated plaintiff ten times between 2013 and 2014 (Tr. 684).

[3] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social and occupational functioning.   Impairment in functioning due to physical or environmental limitations are not considered.   *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000). Although the American Psychiatric Association discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

experience, generalized persistent anxiety, hostility and irritability.  She believed plaintiff's impairments would at least last another year and they exacerbated her experience of pain (Tr. 684).  Ms. Horn opined that plaintiff would be off task more than twenty percent of the day and would require redirection one or two times per day.  She believed plaintiff would be absent from work more than three times a month.  Additionally, plaintiff had marked limitations in her restrictions of daily living and in maintaining social functioning.  Plaintiff would often have difficulties maintaining concentration, persistence or pace, and would have frequent episodes of decompensation (Tr. 685).

Ms. Horn also completed a check-box form regarding plaintiff's limitations.  She indicated plaintiff had mild limitations in her ability to:  remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; understand and remember detailed instructions; sustain an ordinary routine without special supervision; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior; adhere to basic standards of readiness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions.  Plaintiff had moderate limitations in her ability to:  carry out detailed instructions; maintain attention for two hour segments; make simple work-related decisions; work in coordination with or proximity to others without being unduly distracted; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes; and travel in unfamiliar places.

Finally, Ms. Horn indicated plaintiff had marked limitations in her ability to:  maintain regular attendance and be punctual within customary, usually strict tolerances; complete a

normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stress; and use public transportation (Tr. 686-87).

## **Analysis**

Plaintiff argues that the hypothetical question the ALJ posed to the VE and his ultimate RFC assessment did not appropriately incorporate her deficiencies in concentration, persistence or pace.  The Court first notes that plaintiff only presents one primary issue in her complaint.  As a result, any other arguments may be deemed waived as it is not this Court's duty to make legal arguments for the parties involved.  *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). However, while plaintiff only raises one point, it is dispositive and requires remand.

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1).  In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule.  Social Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("S.S.R. 96-8P"); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

In assessing a claimant's RFC, the ALJ must consider *all* of the relevant evidence in the record and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment.  The ALJ's analysis and discussion should be thorough and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  S.S.R. 96-8, at *5, 7. Additionally, the Seventh Circuit has held that an ALJ's assessment must evaluate "evidence of impairments that are not severe" and "must analyze a claimant's impairments in combination."  *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th

Cir. 2012); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

The Commissioner argues that the ALJ's hypothetical and RFC were supported by substantial evidence.   The Commissioner states that the ALJ explained how plaintiff has problems performing mental activities, and some examiners noted this, but "nothing reveals she is consistently precluded from simple, repetitive, and routine tasks" (Tr. 68).  She does not argue that any deficiencies in concentration, persistence or pace are captured by the limitation to unskilled work, but rather that an ALJ may show why difficulties rated "moderate" at steps two and three would not preclude certain types of work when conducting a more detailed RFC analysis.

She makes an analogy to physical impairments, stating that if a plaintiff had moderate difficulties lifting, this would be adequately captured by the RFC indicating what plaintiff could still do in light of those difficulties.   Essentially, she argues that the limitation of simple, routine and repetitive tasks fully and appropriately accounts for plaintiff's moderate difficulties in concentration, persistence or pace.   However, as outlined below, the ALJ's RFC fails to indicate what plaintiff could still do in light of the difficulties in concentration, persistence or pace and is fundamentally flawed as a result.

It is important to note that almost all of the cases the Commissioner cites to support her arguments are not binding on this Court.   She cites several Eighth Circuit cases, a Tenth Circuit case, and a district court ruling that was remanded by the Seventh Circuit.  *Vigil v. Colvin*, 805 F.3d 1199, 1203 (10th Cir. 2015); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1994); *Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007); *Ploense v. Colvin*, No. 15-CV-376, 2016 WL 889587, *9 (E.D. Wis. Mar. 8, 2016).  The district court case she cites states "the ALJ's finding

of moderate limitation in concentration, persistence, or pace at step three does not necessarily translate into a work-related functional limitation for the purpose of the RFC assessment." *Id.* at *9 (*citing Vigil,* 805 F.3d at 1203).  The Court notes that this quote is not binding on this Court as it is from another district court (that was remanded) and cites Tenth Circuit precedent.

Plaintiff cites a series of recent Seventh Circuit cases that have held it is error for an ALJ to not include specific limitations in the RFC assessment when a claimant is found to have moderate difficulties in concentration, persistence or pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); Y*urt v. Colvin*, 758 F.3d 850 (7th Cir. 2014); *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015).

In *O'Connor-Spinner*, the court found that the ALJ needed to orient the VE to all of a claimant's limitations, including deficiencies in concentration, persistence or pace.  The Court stated that there is no *per se* requirement that the phrase "concentration, persistence and pace" be used in the hypothetical, but it went on to hold that the restriction to simple, repetitive tasks is not an adequate substitute because it "will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620-21.

In *Yurt*, the Court stated, "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 859.  Under *Yurt* and *O'Connor-Spinne*r, if a claimant has moderate limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE.

Finally, in *Varga,* the Seventh Circuit most recently held that the terms "simple, routine, and repetitive tasks" referred to unskilled work per the regulations.   The Court noted that "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.*, with difficulties maintaining concentration, persistence, or pace—can perform such work." *Varga,* 794 F.3d 814.

The Commissioner cites the Seventh Circuit case *Capman v. Colvin* to support her contention that the RFC assessment is sufficient.  617 F. App'x 575 (7th Cir. 2015).  In *Capman*, the Court found that the plaintiff's moderate limitations in his ability to complete a day or week of work without interruption did not mean he could not function satisfactorily.  The medical evidence in that case indicated Capman's limitations with concentration, persistence or pace stemmed from his anxiety attacks which only occurred when he was around other people.  As a result, the ALJ's limitations of simple, routine tasks and limited interactions with others specifically addressed Capman's deficiencies with concentration, persistence or pace. *Id.* at 579.

These cases make it clear that if a claimant is found to have limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE.  They have also stated that if an ALJ identifies and excludes a specific work function that triggers the moderate limitations in concentration, persistence or pace, then the RFC determination will be upheld.  Here, plaintiff's problems with concentration, persistence or pace stem from her migraine headaches, fatigue, fibromyalgia, depression, and anxiety.  The ALJ's broad limitations of simple, routine, and repetitive tasks failed to address any of plaintiff's individualized problems.   He did not include limited interaction with others, nor did he indicate how the limitations he did include addressed plaintiff's issues with concentration, persistence or pace.  This is error.

The Commissioner argues that the cases plaintiff cites are distinguishable from the case at hand.  She states that because the state agency physicians on record did not conclude plaintiff had moderate difficulties in concentration, persistence or pace, *Yurt* and *Varga* are inapplicable. She also contends that *O'Connor-Spinner* does not apply here because neither the state agency consultants nor the ALJ indicated plaintiff had moderate difficulties in concentration, persistence or pace within the RFC finding.  However, as plaintiff notes, those cases did not state that the ALJ's moderate finding must be supported by a state agency physician's checklist.  The determining factor within the medical record is not the exact source or format of evidence of impairment in concentration, persistence or pace, but rather that there was such evidence in the medical history credited by the ALJ.  *Varga*, 794 F.3d at 814.  Essentially, once an ALJ has credited a moderate impairment in concentration, persistence or pace, the ALJ is required within the RFC and VE hypothetical question to "take into account any moderate difficulties in mental functioning" found in the record.  *Id.* at 816; *Yurt*, 758 F.3d at 859; *O'Connor-Spinner*, 627 F.3d at 619-21.

The Commissioner also argues that plaintiff's medical records and daily activities support the ALJ's findings.  She cites doctors' observations that show plaintiff could follow complex commands, had no memory loss, could spell words backwards and forwards, could do simple calculations, and could recall 3/3 objects after five minutes (Tr. 68, 362, 372).  The Commissioner relies on the ALJ's statements that plaintiff "performed activities that required performing at least simple, repetitive, and routine tasks such as managing money, buying groceries, and reading" (Tr. 68).  She also quotes the ALJ's statement that plaintiff's ability to care for dogs and herself, drive an automobile, pay bills, handle a savings account and use a

checkbook "indicate a greater ability to perform work-related activities such as lifting, walking, standing, sitting, and concentrating than the claimant alleged" (Tr. 64).

The Seventh Circuit has repeatedly held it is appropriate to consider activities of daily living but it should be done with caution.   The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).   Plaintiff had well documented fibromyalgia, depression, headaches and fatigue. Plaintiff reported very limited daily activities that could all be performed at her own pace and with significant breaks.   Her daily activities did not indicate in any way that she would have been capable of working an entire workday without significant issues relating to concentration, persistence or pace.   Contrary to the Commissioner's argument, the Seventh Circuit has held that when the ALJ determines a plaintiff has a moderate difficulty in concentration, persistence or pace, he is required to include those limitations in his hypothetical to the VE as well as explain how they factor into his RFC assessment.   ALJ Davis's failure to do so is error.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).   ALJ Davis simply failed to do so here.   "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue,* 697 F.3d 642, 646 (7th Cir. 2012)(citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

Because of the ALJ's error in evaluating plaintiff's RFC determination in this case, it must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Maria Passig's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. § 405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: December 19, 2016.**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**